T.C. Memo. 2017-125

UNITED STATES TAX COURT

JEREMY RAY SUMMERS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 32259-15.                              Filed June 26, 2017.

Jeremy Ray Summers, pro se.

<u>Brandon A. Keim</u>, <u>Doreen Marie Susi</u>, and <u>Rachael J. Zepeda</u>, for
respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, <u>Judge</u>:  The Internal Revenue Service (IRS or respondent) deter-
mined a deficiency of $1,738 in petitioner's Federal income tax for 2013.  The
sole question for decision is whether petitioner is liable for the 10% additional tax
imposed by section 72(t)(1) on early distributions from a qualified retirement

**[*2]** plan.[1]  Petitioner claims an exception from this additional tax under section 72(t)(2)(C), which applies to a distribution made to an "alternate payee" pursuant to a "qualified domestic relations order" (QDRO).  Although we have great sympathy for petitioner's position, we are unable to conclude that he satisfied the technical requirements that Congress placed in the statute.  We accordingly have no alternative but to sustain the deficiency determination.

FINDINGS OF FACT

The parties filed a stipulation of facts with attached exhibits that is incorporated by this reference.  Petitioner resided in Arizona when he filed his petition.

During 2013 petitioner Jeremy Ray Summers (Jeremy), then age 35, was employed by Intel Corp. as a manufacturing technician.  He was married to Karie Rae Summers (Karie), and they had four young children.  Jeremy and Karie concluded that their marriage had irretrievably broken down and decided to separate.  To their credit they were determined to do this in the least acrimonious manner possible.  And to minimize costs they decided to accomplish their divorce without involving lawyers.

---

[1]All statutory references are to the Internal Revenue Code in effect for the tax year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all monetary amounts to the nearest dollar.

**[\*3]**  Jeremy and Karie reached an agreement concerning child custody, visitation rights, child support, spousal maintenance, and division of property.  On March 18, 2013, Jeremy filed a petition for dissolution of marriage, incorporating these agreements, in the Superior Court of Arizona, Maricopa County.  At that time he had an individual retirement account (IRA) administered by Edward D. Jones & Co. that he believed should be split 50-50 with Karie.  His petition for divorce accordingly requested that "[t]he proceeds of IRA should be divided 50% to Petitioner and 50% to Respondent."

Karie did not work outside the home and had several debts.  With the divorce petition pending, she was eager to simplify her financial affairs in order to get a fresh start.  To accommodate her wishes Jeremy agreed to split the value of the IRA before the divorce decree became final.

In late April 2013 Jeremy withdrew the total proceeds of the IRA, $17,378.  On April 30, 2013, he deposited a check in that amount in a Bank of America checking account that he and Karie jointly held.  The next day he wrote a check for $8,618 to pay off Karie's obligation on a car loan.  He later transferred another $71 to her to ensure that she received her full 50% interest in the IRA.

On June 3, 2013, the Arizona trial court entered a consent decree of dissolution of marriage.  This decree incorporated substantially all of the agreements set

**[\*4]** forth in Jeremy's March 18 petition. However, since he and Karie had already divided up the IRA, the decree provided, in an attached exhibit captioned "Property and Debts," that "[n]either party has a retirement, pension, deferred compensation, §401(k) Plan and/or benefits."

Jeremy timely filed a Form 1040, U.S. Individual Income Tax Return, for 2013, claiming head-of-household filing status. On this return he properly reported the $17,378 distribution from his IRA as a taxable distribution. However, he did not report on line 58 any "additional tax" attributable to the fact that it was an early distribution.

The IRS received from Edward D. Jones & Co. a Form 1099-R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc., reporting the $17,378 distribution as an "early distribution, no known exception." This triggered a document-matching audit. On September 21, 2015, the IRS issued Jeremy a timely notice of deficiency determining that he was liable for the 10% additional tax under section 72(t)(1). He timely petitioned this Court to challenge that determination.

**[\*5]**                                                    OPINION

A.      Burden of Proof

The IRS' determinations in a notice of deficiency are generally presumed correct though the taxpayer can rebut this presumption. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Because section 72(t) imposes an "additional tax" as opposed to a "penalty" or an "addition to tax" within the meaning of section 7491(c), Jeremy bears the burden of production. See El v. Commissioner, 144 T.C. 140, 145-149 (2015). In certain circumstances the burden of proof on factual issues may shift to respondent. See sec. 7491(a); Rule 142(a)(1). Jeremy does not contend that this provision applies here.

B.      Analysis

Section 72(t)(1) imposes a 10% additional tax on early distributions from qualified retirement plans. A qualified retirement plan includes an IRA. See secs. 408(a), 4974(c)(4); Bunney v. Commissioner, 114 T.C. 259, 265 (2000). Section 72(t)(2) lists various types of distribution that are excepted from this additional tax, such as the exception (concededly inapplicable here) for a distribution to a taxpayer age 59-1/2 or older. See sec. 72(t)(2)(A)(i).

The exception on which Jeremy relies appears in section 72(t)(2)(C). It applies to a distribution that is made "to an alternate payee pursuant to a qualified

**[*6]** domestic relations order (within the meaning of section 414(p)(1))." Section 414(p)(8) defines an "alternate payee" as "any spouse, former spouse, child or other dependent of a participant who is recognized by a domestic relations order as having a right to receive all, or a portion of, the benefits payable under a plan with respect to such participant." Section 414(p)(1)(B) defines a "domestic relations order" as a "judgment, decree, or order" relating to "the provision of child support, alimony payments, or marital property rights" that "is made pursuant to a State domestic relations law."

Karie indirectly received half the value of Jeremy's IRA account, and respondent readily agrees that the transaction could likely have been organized so as to entitle Jeremy to a section 72(t)(2)(C) exception for her 50% share. (Jeremy concedes that he erred in claiming this exception for his own 50% share.) As it is, respondent contends persuasively that Jeremy does not qualify for this exception for two reasons.

First, the IRA distribution was made directly to Jeremy, and he deposited the check into a bank account that he and Karie jointly held. He subsequently transferred, to Karie or for her benefit, an amount equal to half of the proceeds. But while she ultimately received those proceeds, the distribution itself was made

**[\*7]** to Jeremy, not to "a former spouse * * * who is recognized by a domestic relations order as having a right to receive" a share of the proceeds. See sec. 414(p)(8).

Second, the distribution was not made "pursuant to a qualified domestic relations order." Although Jeremy's petition for dissolution of marriage requested a 50-50 division of the IRA, any judicial action on that request was pretermitted by his well-intentioned decision to divide the IRA with Karie a month before the divorce decree was entered. That decree accordingly recited that "[n]either party has a retirement, pension, deferred compensation, §401(k) Plan and/or benefits." The IRA distribution was not made "pursuant to" that order or any other judicial decree.

We have held that a taxpayer must strictly comply with the requirements of section 72(t)(2)(C) in order to be entitled to the exception it provides. See Hartley v. Commissioner, T.C. Memo. 2012-311, 104 T.C.M. (CCH) 553, 554 (stating that in order for a distribution to qualify for this exception, the distribution must be made directly "in response to a qualified domestic relations order"); Bougas v. Commissioner, T.C. Memo. 2003-194, 2003 WL 21512099, at \*3 (stating generally that the requirements of the QDRO provisions must be "rigidly observed" because they "relate to the substance or essence of the statute"). We have con-

**[*8]** siderable sympathy for petitioner's position:  In effect, his willingness to help minimize stress on his soon-to-be ex-wife disabled him from satisfying the statutory requirements.  But we are not at liberty to add equitable exceptions to the statutory scheme that Congress enacted, and we thus have no alternative but to sustain the 10% additional tax that respondent has determined.

To implement the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.